# CIRCUIT COURT OF LOUDOUN COUNTY

Commonwealth of Virginia

v.

Marcus Lavon Simms

January 31, 2000

Case Nos. (Criminal) 12666 and 12792

BY JUDGE JAMES H. CHAMBLIN

The defendant, Marcus Lavon Simms, has been indicted for the offenses of rape, forcible sodomy, object penetration, malicious wounding, and robbery in Criminal No. 12666 and abduction with the intent to defile in Criminal No. 12792. The offenses are alleged to have occurred on or about September 14, 1999, at a 7-Eleven store on Plaza Street in the Town of Leesburg.

The defendant filed a motion to suppress oral and written statements he made to Leesburg Police detectives on September 16, 1999.

After consideration of the written motion, the evidence (being only the testimony of one of the detectives involved), and the argument of counsel on January 19, 2000, the motion to suppress is denied.

*Posture of the Cases*

Although there is no paper styled "Motion to Suppress" in either Criminal No. 12666 or 12792, I am treating the "Memorandum of Points and

Authorities" filed by the defendant on December 10, 1999, in Criminal No. 12666 to be the suppression motion heard on January 19, 2000, and to apply to both cases.

The defendant was indicted in Criminal No. 12666 on November 8, 1999. He was not indicted in Criminal No. 12792 until January 10, 2000 (after the suppression motion was filed). I find no court orders whatsoever in Criminal No. 12792, but there is a notation on the commitment order signed by the deputy clerk on January 11, 2000, that Criminal No. 12792 was then continued for review to January 19, 2000, at 2:00 p.m., which was the day and time set for pretrial motions in Criminal No. 12666 on December 13, 1999.

Before the hearing on the suppression motion commenced on January 19, 2000, at 2:00 p.m., defense counsel stated that the suppression motion was the only pretrial motion to be heard in both cases and that the cases were set for trial on March 6 and 7, 2000, with a jury at the request of the Commonwealth.

## Findings of Fact

On September 16, 1999, Detectives William Potter and Leah Dwyer of the Leesburg Police Department were aware of certain criminal offenses that had occurred a few days before at the 7-Eleven store on Plaza Street in the Town of Leesburg.

Potter had viewed a surveillance tape of the 7-Eleven store at or about the time the offenses were committed. He recognized a black male on the tape as the defendant, Marcus Lavon Simms. Potter had known the defendant since 1994 and had seen him at various times and places in Leesburg since 1994. On the morning of September 16, 1999, Potter asked Deputy Ricky Frye of the Loudoun County Sheriff's Department to view the tape. Frye confirmed to Potter that the black male on the 7-Eleven surveillance tape was the defendant. Frye had previously been a detective with the Leesburg Police Department. Both Potter and Frye had known the defendant for several years before that morning. See the Stipulation dated January 19, 2000, signed by the defendant and counsel, admitted in evidence as Commonwealth's Exhibit No. 4, and sealed by the Court by agreement.

Potter and Dwyer decided to try to find the defendant and to talk to him.

Potter had prior knowledge that the defendant might be at a townhouse on Plaza Street in Leesburg almost directly across the street from the police station. Potter and Dwyer proceeded in Dwyer's unmarked, four-door police vehicle to the townhouse. Frye drove to the townhouse in his marked County vehicle. Potter and Dwyer parked a couple spaces down from the townhouse.

Both Potter and Dwyer were in plain clothes. Each had a weapon, but it was covered by clothing. Potter wore his badge on a chain around his neck. Potter and Dwyer went to the front stoop of the townhouse. One of them knocked on the door. Frye had gone to the rear of the townhouse.

After the knock, a child came to the window and then went away. Then the defendant opened the door. Potter did not identify himself, but the defendant knew Potter and knew that he was a police officer. The defendant saw Potter's badge on the chain around his neck. Potter asked the defendant how he was doing. The defendant acknowledged Potter. Potter introduced Dwyer to the defendant as a police officer.

Potter told the defendant that he was working on a case and would like to talk to the defendant about it at the police station. The defendant said, "O.K." The defendant did not ask Potter why he wanted to talk to him. Potter told the defendant he was not under arrest. Potter did not tell the defendant that he did not have to come or that he could just close the door. He did not ask the defendant to meet him at the station. The detective never asked to speak to the defendant at his home.

The defendant had no shoes on so Potter told him he could get some shoes. The defendant went back inside and closed the door. Within a reasonable period of time, the defendant came back out with his shoes on. Dwyer told the defendant that they could give him a ride to the police station right across the street. The defendant agreed.

Potter let Frye know that he and Dwyer had made contact with the defendant. Frye came around to the front of the townhouse.

Dwyer got in the driver seat of her vehicle. Potter got in the back seat of the vehicle. As the defendant was about to enter the front passenger seat of Dwyer's vehicle, Frye without a request from the detectives said he wanted to pat down the defendant. Frye never told the defendant why he wanted to conduct a pat down. Frye patted down the defendant, and then the defendant took the front passenger seat. Frye was not involved any further with the defendant after the pat down.

They drove across the street to the police station. There was no conversation with the defendant in the police vehicle on the way to the station.

Dwyer parked her vehicle in the rear of the station in an outside parking lot where patrol cars are parked. They got out and went in the rear non-public entrance of the station using a card key to open the door. The defendant walked in with the two detectives. The detectives did not touch the defendant as they went into the station. Inside the station, they went into the first door on the right, which led to the criminal investigation section. They went to an

interview room to the left inside the door. The defendant was aware that he was in the criminal investigation section of the police station.

The detectives asked the defendant to have a seat in a chair in the interview room. The defendant did so, and the two detectives left him alone in the room. The room was never locked.

The interview room is approximately ten feet by twelve feet. It has one door and no windows. There is carpet on the floor and on the walls for sound reduction and privacy. The room contained a four legged table and three chairs. There was a telephone on the table. On the ceiling in plain view, were a sprinkler head, a motion sensor, and a video camera mounted on an arm from the ceiling. The camera pointed at the table.

The detectives went to another room, secured their weapons and "collected their thoughts" before returning after a short period of time to the interview room where the defendant was seated. Each detective sat in a chair. Potter sat in the chair at the table closest to the defendant who sat in the chair at the end of the table. The door to the interview room was closed when they talked to the defendant. Of the three, the defendant sat closest to the door.

Potter reminded the defendant that he was not under arrest. The detectives never told the defendant that he was free to leave or asked him if he wanted to leave. The defendant never asked to leave.

After some small talk, Potter asked the defendant what he had been doing on the day of the offenses. The defendant had never been asked about and had never been told by the detectives about any of the offenses. The defendant said he had been at home watching movies on a VCR. The defendant was asked if he had gone outside or gone to the 7-Eleven store which is two or three tenths of a mile from the townhouse where the detectives had located the defendant. The defendant did not respond. Potter then told the defendant that he knew that he had been at the 7-Eleven store because the defendant was on a surveillance tape.

Potter also told the defendant that he did not think that the defendant was a suspect, but that he may be a witness or may have seen something. This statement was not true because even before the detectives went to see the defendant, he was their primary suspect.

The defendant then admitted to being at the 7-Eleven store about midnight to get some cigarettes.

Another detective then brought in a VCR on which the 7-Eleven surveillance tape was played for the defendant. The other detective left after the tape started. The defendant saw the tape and acknowledged that it was he on the tape; Dwyer immediately told the defendant that he was under arrest. She did not tell him what he was under arrest for. From the time the detectives

came to the defendant's door until after the defendant was advised of his rights and began making incriminating statements, the detectives never told him what offenses they were investigating. The defendant was not handcuffed after he was placed under arrest. The defendant had been at the station about thirty minutes before he was arrested.

After Dwyer told the defendant that he was under arrest, Potter told the defendant that Dwyer would advise him of his rights and that after that Potter wanted to ask the defendant some more questions. The defendant said "O.K."

Dwyer then proceeded to read to the defendant his rights from a form styled "Your Rights," which was admitted in evidence as Commonwealth's Exhibit No. 2. The defendant followed along with Dwyer as she read his rights to him. Dwyer made a notation of "1101" after "Time" in the upper right corner of the form. She also made a notation of "1102" after "Time" in the lower left corner of the form. The defendant initialed at the end of each of the five paragraphs concerning his rights, and he signed below the paragraph styled "Waiver of Rights." The defendant asked no questions during the reading of his rights. Dwyer and Potter signed the form as witnesses. The defendant said he wanted to waive his rights after he signed the form.

Potter asked the defendant about his education, whether or not he was under the influence of alcohol or drugs, and how he felt. The defendant responded that he had completed the eleventh grade, was not under the influence, and felt O.K. Potter made notations of these responses in the lower right corner of the form.

Potter proceeded to tell the defendant that he needed to "get it off his chest" and tell them what happened. The defendant then made incriminating statements, both oral and written, which he seeks to suppress.

The detectives had not secured arrest warrants for the defendant before he was arrested by Dwyer.

## Conclusions of Law

The defendant contends that considering the totality of the circumstances his statements were involuntary because of the tactics used by the police during his interrogation. He also contends that the same police tactics caused his waiver of his rights to be involuntary. I do not agree.

For reasons that follow, I find that the defendant voluntarily went with the detectives to the police station, that he voluntarily spoke with the detectives and answered their questions, that the defendant was not in custody for purposes of *Miranda* until he was arrested, that immediately after he was arrested the defendant was given the *Miranda* warnings, and that the

defendant voluntarily, knowingly, and intelligently waived his rights before he made further incriminating statements.

The detectives went to the townhouse to speak to the defendant, knocked, but said nothing before the defendant opened the door. The defendant could have refused to answer the door or he could have made an inquiry before opening the door. Instead, he opened the door without asking who was there and why.

Potter told the defendant that he would like to talk to him, and the defendant agreed. The defendant knew Potter was a police officer. He learned very quickly that Dwyer was also a police officer. The defendant had reason to believe each detective was armed although wearing plain clothes. A reasonable person knows that a police officer to whom he is speaking is probably armed; nevertheless, that does not compel the person to speak. The detectives never threatened the defendant and no weapons were ever drawn on the defendant. The defendant was not compelled or ordered by the detectives to go to the police station for questioning. The detectives never made any promises to the defendant.

The detectives permitted the defendant to go back inside the townhouse and put on his shoes without restraint of freedom. No officer entered the townhouse. The door was closed on the officers while the defendant went back inside. No threats were made to compel the defendant to find his shoes and return to the awaiting officers. The defendant points out that Frye went to the rear of the townhouse in an effort to show that the defendant felt surrounded by police. However, there was no evidence that the defendant ever saw Frye or knew where he was until he approached and patted down the defendant after he left the townhouse.

The detectives may not have told the defendant at the townhouse why they wanted to talk to him, but Potter advised the defendant that he was not under arrest. The defendant agreed to go without asking why or without asking about what they wanted to talk to him about. A reasonable person feeling compelled to go with the police for questioning would want to know why he is being taken to the police station.

Neither detective ever touched the defendant. He walked voluntarily out of the townhouse and accepted Dwyer's offer of a ride to the station in her vehicle. He was not forced to ride in the vehicle. The detectives were not required to tell the defendant that he could have gone to the station by other means any more than they were required to tell him that he did not have to talk to them.

I do not feel that the pat down of the defendant by Frye made him feel compelled to go with the detectives and to talk to them. The pat down was

done for the officers' safety, not to intimidate the defendant. The defendant had prior experience with the police because of his past criminal record and the matters that are the subject of the stipulation. The defendant did not hesitate to consent to the pat down. He did not ask why he was being patted down.

The detectives allowed the defendant to open the vehicle door and ride in the front passenger seat to the station. He was never handcuffed. I do not agree with defense counsel that only arrested persons ride in police cars.

The defendant entered the police station with the detectives by a rear, non-public, locked entrance. There was no evidence that a key was needed to get out of the rear entrance or that the defendant knew that a key was needed to get out. I do not think that the average person would feel, for safety reasons, that a key would be needed to exit a building through an exterior door. There was no evidence that the rear door was not an exit door.

The interview room to which the defendant was led was not threatening or imposing. The carpeting for soundproofing keeps outside sounds out as much as it keeps inside sounds within the room. I feel that an average person would rather speak to the police in private instead of in a public area where other persons could see and hear what was going on and being said. Similarly, the average person would not want to be seen by the public going into a police station in the company of the police. The detectives interviewed the defendant on a Thursday morning during normal working hours. The public would more likely be around the police station during normal weekday working hours.

The defendant should have known that the interview room was one used by the police to interrogate suspects. He was familiar with the police and their activities. The interrogation was not taped or recorded. There is no evidence that would lead a reasonable person to feel that the interview was being taped. The door to the interview room was unlocked. There was no evidence that would lead the defendant to believe it was locked.

The detectives did not raise their voices while talking to or questioning the defendant. The period of time before the defendant was arrested was not lengthy. The detectives might not have told the defendant that he was free to leave or ask him if he wanted to leave, but they never told him that he could not leave up until he was arrested. The defendant knew or should have known that as soon as he was arrested, he was not free to leave.

Clearly the detectives had probable cause to arrest the defendant when they went to the townhouse. Clearly the defendant was the primary suspect for these serious offenses. But there was no evidence that the defendant knew what the detectives knew or knew that they had probable cause to arrest him or that he was their primary suspect. The police should not be prohibited from

speaking to a suspect just because the police have probable cause to arrest the suspect. The police should be able to continue their investigation even after probable cause exists. Further investigation could uncover not only further evidence of guilt but also evidence of innocence.

From the time that the detectives first had contact with the defendant to the time he was arrested, the defendant was not in custody. The defendant was left alone for awhile in the interview room before the detectives returned to question him. An average person would feel that the police would not leave a real suspect alone in an unlocked room with the ability to leave the station.

The defendant places a great deal of emphasis on the fact that he was never told what offenses the detectives were investigating and why he was arrested. There is no rule or law requiring the police to advise a person what offenses are being investigated before the person is questioned or advised of his rights. There is no rule or law that a person has to be told why he is arrested at the very moment he is arrested. There is no evidence that the detectives' tactics were deceitful or overbearing, thereby critically impairing the defendant's capacity for self-determination. There is no evidence that the defendant asked about the alleged offenses and in response to his inquiries the detectives withheld or manipulated the nature of the offenses. The defendant knew from the start of the detectives' questioning that the offenses had occurred several days before at the 7-Eleven store on Plaza Street. If the defendant was involved in the offenses, then he could easily have figured out what offenses were being investigated.

The failure of the detectives to secure any more information from the defendant before he was arrested or the intent of the detectives to arrest the defendant eventually, regardless of what he might say, is of little significance. There is no evidence that the defendant knew what the detectives knew before he started to talk to them or knew of their intent to arrest him no matter what happened.

The defendant also argues that his statements were obtained involuntarily. I do not agree. His statements were all made voluntarily. They were all a product of a rational intellect and a free will. I reach this conclusion for the reasons stated above on the custody issue, but also for the additional reasons that follow.

The defendant finished the eleventh grade. There was no evidence of any mental or emotional defect or intellectual deficiency. I observed the defendant during the suppression hearing. He was fully aware of what was going on during the hearing, and he interacted appropriately with his counsel.

There was no evidence that the defendant did not understand what he was being told or asked by the detectives. There was no problem in communication between the detectives and the defendant.

The defendant was not under the influence of drugs or alcohol. He was not deprived of any physical comforts.

The defendant asserts that he was tricked by the detectives when Potter told him at the station that the defendant may only be a witness or know something when the defendant was clearly the prime suspect. There is no rule that a defendant's statements to the police automatically become involuntary if they are made after a police officer tells the defendant a lie. Under all the circumstances, I do not feel that this one lie is of such significance as to have caused the defendant to make an incriminating statement involuntarily.

As I stated at the hearing, I do believe that it is common knowledge that the actions taken by a police officer in questioning a suspect are designed to get the suspect to talk. However, that does not mean that such actions automatically mean that the defendant's free will is overborne by such actions. The police have to have the ability to investigate suspected crimes. A part of that investigation must necessarily include the ability to talk to a suspect as long as the actions of the police do not compel a suspect to say something incriminating.

After the defendant was placed under arrest, he clearly became in custody. As required by *Miranda*, the defendant was immediately advised of his rights. I do not feel that Potter's statement to the defendant after his arrest that Dwyer would advise him of his rights and then Potter would ask him more questions would have caused the defendant to involuntarily waive his rights and continue to answer their questions. Potter merely told the defendant that he wanted to ask the defendant more questions. He did not tell the defendant that he must answer the questions. He did not order the defendant to answer.

Potter's uncontradicted testimony is that Dwyer read to the defendant each of his rights, that the defendant initialed next to each right on the rights form, and that the defendant signed the "Waiver of Rights" portion of the rights form. The defendant argues that the advice of rights took only one minute because of the "1101" written by Dwyer in the upper right corner of the rights form and the "1102" she wrote in the bottom left corner of the form. However, Potter did not testify as to what those times meant. He did testify that he had no independent recollection of how long it took Dwyer to advise the defendant of his rights.

I cannot conclude from the evidence that the advice of rights took only one minute. But I can conclude from the evidence presented that the defendant read along as Dwyer advised him of his rights from the rights form, that the

defendant read the "Waiver of Rights" portion of form, and he signed the "Waiver of Rights."

I find that all the statements, oral and written, made by the defendant to the Leesburg detectives on September 16, 1999, were made voluntarily, and that, after he was arrested, the defendant waived his rights knowingly, intelligently, and voluntarily.